**Scott NELSON and Vivian Nelson, Individually and as Husband/Wife, Plaintiffs–Appellants,**

v.

**SAUDI ARABIA, King Faisal Specialist Hospital, Royspec, Defendants–Appellees.**

No. 89–5981.

United States Court of Appeals, Eleventh Circuit.

Feb. 21, 1991.

Jorge A. Duarte, P.A., Miami, Fla. and Anthony D'Amato, Northwestern University School of Law, Chicago, Ill, for plaintiffs-appellants.

Maureen E. Mahoney, Lathan & Watkins, Washington, D.C., for Saudi Arabia.

Marc Cooper, Cooper, Wolfe & Bolotin, P.A., Miami, Fla., for King Faisal Hosp. and Saudi Arabia.

Before EDMONDSON and BIRCH, Circuit Judges, and RE *, Chief Judge.

RE, Chief Judge:

Plaintiffs-appellants, Scott and Vivian Nelson, appeal from a judgment of the United States District Court for the Southern District of Florida, dismissing their claim against defendants-appellees, Saudi Arabia, King Faisal Specialist Hospital, and Royspec, for lack of subject matter jurisdiction under the Foreign Sovereign Immunities Act of 1976.

Scott Nelson was hired, in the United States, as a monitoring systems engineer for the King Faisal Specialist Hospital (the Hospital) in Riyadh, Saudi Arabia. Nelson alleged that, in the course of performing his duties under his employment contract with the Hospital, he was detained and tortured by agents of the Saudi government in Saudi Arabia in retaliation for reporting safety violations at the Hospital.

Nelson brought suit for his injuries against Saudi Arabia, the Hospital, and Royspec, a corporation owned and controlled by the government of Saudi Arabia (collectively Saudi Arabia). Nelson alleged subject matter jurisdiction under the Foreign Sovereign Immunities Act of 1976 (the FSIA). The district court concluded that Nelson's claims were not based upon the commercial activities of Saudi Arabia carried on in the United States, as required by the FSIA, and granted Saudi Arabia's motion to dismiss for lack of subject matter jurisdiction.

On appeal, Nelson contends that the district court erred in granting Saudi Arabia's motion to dismiss. Nelson asserts that, since his detention and torture were based upon his recruitment and hiring in the United States by an agent of the Saudi government, the district court has subject matter jurisdiction under the FSIA.

The question presented is whether the district court erred in determining that it does not have subject matter jurisdiction under the FSIA. More specifically, did the

---

* Honorable Edward D. Re, Chief Judge of the United States Court of International Trade, sitting by designation.

court have jurisdiction in this action for damages for the detention and torture of Nelson by agents of the Saudi government, in Saudi Arabia, in retaliation for Nelson's conduct during his employment in Saudi Arabia in a position for which he was recruited and hired in the United States by an agent of the Saudi government.

Since we conclude that Nelson's detention and torture were based upon the recruitment and hiring of Nelson in the United States by an agent of the Saudi government, and that the recruitment and hiring was a commercial activity of Saudi Arabia, we hold that the district court has subject matter jurisdiction under the FSIA. Accordingly, we reverse the judgment of the district court.

## BACKGROUND

In 1983, Scott Nelson, while in the United States, saw a printed advertisement recruiting employees for the King Faisal Specialist Hospital (the Hospital), in Riyadh, Saudi Arabia. The recruitment was conducted by the Hospital Corporation of America (HCA), an independent corporation which, in 1973, had contracted with the Royal Cabinet of the Kingdom of Saudi Arabia to recruit employees for the hospital.

After submitting an application, Nelson was interviewed in Saudi Arabia by two officials of the Hospital. Subsequently, he returned to the United States, and entered into a contract of employment with the Hospital as a monitoring systems engineer. The contract was signed in Miami, Florida, in November, 1983.

Nelson commenced employment at the Hospital on December 7, 1983. As stated in the Hospital's job description for monitoring systems engineer, Nelson was "[r]esponsible for the development and expansion of electronic monitoring and control systems capabilities." He was also responsible for recommending "modifications of existing equipment and the purchase and installation of new equipment."

Nelson alleges that, on March 20, 1984, in the course of his duties at the Hospital, he discovered certain safety hazards, and reported these safety hazards to an investigative commission of the Saudi government. Nelson states that, on September 27, 1984, he was summoned to the Hospital's security office by agents or employees of the Hospital. He alleges that, from the security office, he was moved to a jail cell where he was "shackled, tortured and beaten" by agents or employees of the Saudi government. Nelson states that he was imprisoned for 39 days, during which time he was never informed of any charges against him, nor was he ever accused of a crime. He further states that his wife was told by a Saudi government official that he could be released if she provided sexual favors.

Nelson and his wife, Vivian Nelson, sued Saudi Arabia, the Hospital, and Royspec, a corporation owned and controlled by the Saudi government which acts as a purchasing agent for the Hospital. Nelson sought compensatory and punitive damages under 16 counts, and asserted that the district court had subject matter jurisdiction under the Foreign Sovereign Immunities Act of 1976, codified at 28 U.S.C. §§ 1602–1611. Saudi Arabia moved for dismissal for lack of subject matter jurisdiction.

The district court concluded that "the link between the recruitment activities and the Defendants is not sufficient to establish 'substantial contact' with the United States," within the meaning of 28 U.S.C. § 1603(e). *Nelson v. Saudi Arabia*, No. 88–1791, slip op. at 5 (S.D.Fla. Aug. 11, 1989). The district court also noted that "even if the court had determined that [the Hospital] and Saudi Arabia had carried on commercial activities having substantial contact with the United States through the indirect recruitment activities, the court would be unable to find a nexus between those activities and Nelson's complaint." *Id.* at 8. Accordingly, the district court granted Saudi Arabia's motion to dismiss for lack of subject matter jurisdiction, thereby dismissing the action against all defendants.

## DISCUSSION

In *The Schooner Exchange v. M'Faddon*, 11 U.S. (7 Cranch) 116, 136, 3 L.Ed.

287 (1812), the Supreme Court adopted the common law doctrine of foreign sovereign immunity. As noted in *The Schooner Exchange*, the doctrine of foreign sovereign immunity rests on principles of comity between nations. *See id.* at 135–36. *See also Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486, 103 S.Ct. 1962, 1967, 76 L.Ed.2d 81 (1983).

On the question of foreign sovereign immunity, the Supreme Court has generally deferred to the decisions or recommendations of the Executive Branch of government. *See id.; Ex Parte Republic of Peru*, 318 U.S. 578, 586–90, 63 S.Ct. 793, 799–800, 87 L.Ed. 1014 (1943) (discussing reasons for deferring to Executive Branch). Consequently, "[f]or more than a century and a half, the United States generally granted foreign sovereigns complete immunity from suit in the courts of this country." *Verlinden*, 461 U.S. at 486, 103 S.Ct. at 1967.

The doctrine of foreign sovereign immunity is closely related to the act of state doctrine. As articulated in *Underhill v. Hernandez*, 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897), under the act of state doctrine:

> Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.

*Id.* at 252, 18 S.Ct. at 84. *See also Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 691 n. 7, 96 S.Ct. 1854, 1859 n. 7, 48 L.Ed.2d 301 (1976).

Neither the doctrine of foreign sovereign immunity nor the act of state doctrine are as widely applied now as in the past. Indeed, it was suggested years ago that the act of state doctrine had "earned a well-deserved rest." E. Re, *Foreign Confiscations in Anglo–American Law* 170 (1951). *See also* Cardozo, *International Law in the New York Courts—1953*, 40 Cornell L.Q. 97, 109 (1955) ("the urge to grant sovereign immunity has also lost much of

its force"). Surely, "the mere assertion of sovereignty as a defense to a claim arising out of purely commercial acts by a foreign sovereign is no more effective if given the label 'Act of State' than if it is given the label 'sovereign immunity.'" *Alfred Dunhill*, 425 U.S. at 705, 96 S.Ct. at 1866.

The present restrictive attitude in the application of the act of state doctrine is reflected in Justice Scalia's opinion in *W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp.*, —— U.S. ——, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990). In *Kirkpatrick* the plaintiff, an American corporation that unsuccessfully bid on a public works contract in Nigeria, sued the defendant, an American corporation that was the successful bidder on the contract. The plaintiff brought suit for damages, and contended that the defendant, which had pled guilty to violations of the Foreign Corrupt Practices Act of 1977, had paid bribes to Nigerian officials in order to obtain the contract. *See id.* 110 S.Ct. at 702–03. The defendant moved to dismiss, contending that the suit was barred by the act of state doctrine. The district court granted the motion to dismiss. The Court of Appeals for the Third Circuit, however, reversed, and the Supreme court granted the defendant's writ of certiorari. *See id.* at 703–04.

In *Kirkpatrick*, the Supreme Court noted that, in prior opinions, several Justices had suggested an exception to the act of state doctrine for commercial transactions. *See id.* at 704 (citing *Alfred Dunhill*, 425 U.S. at 695–706, 96 S.Ct. at 1861–1867 (opinion of White, J.)). The Court stated that, apart from any exceptions, the act of state doctrine does not apply in *Kirkpatrick*, since "[n]othing in the present suit requires the court to declare invalid, and thus ineffective as 'a rule of decision for the courts of this country,' the official act of a foreign sovereign." *Id.* (quoting *Ricaud v. American Metal Co.*, 246 U.S. 304, 310, 38 S.Ct. 312, 314, 62 L.Ed. 733 (1918)).

The present application of the doctrine of foreign sovereign immunity was significantly influenced by the shift or change in United States policy announced in the May 19, 1952 letter from the Acting Legal Ad-

viser of the Department of State to the Acting Attorney General. After referring to the classical or "absolute" theory of sovereign immunity, the letter stated that " 'it will hereafter be the Department's policy to follow the restrictive theory of sovereign immunity in the consideration of requests of foreign governments for a grant of sovereign immunity.' " 26 Dep't St.Bull. 984, 985 (1952) (quoting Letter from Jack B. Tate, Acting Legal Adviser, Department of State, to Acting Attorney General Phillip B. Perlman (May 19, 1952)).

The restrictive theory of sovereign immunity which was embraced by the 1952 policy grants immunity to a foreign sovereign only for acts characterized as "public" and not as to those deemed "private." According to the modern theory, a state may be held liable in the courts of another nation if "it engages in an industrial, commercial, financial or other business enterprise in which private persons may there engage, or does an act there in connection with such an enterprise wherever conducted, and the proceeding is based upon the conduct of such enterprise or upon such act." Article 11, Draft Convention on Competence of Courts in Regard to Foreign States, *quoted in* Re, *Judicial Developments in Sovereign Immunity and Foreign Confiscations*, 1 N.Y.L.Forum 160, 167 (1955).

In the Restatement, it is stated that under the act of state doctrine the courts of the United States "will generally refrain from ... sitting in judgment on other acts of a governmental character done by a foreign state within its own territory and applicable there." Restatement (Third) of Foreign Relations § 443(1) (1987). It has been noted, however, that the effect of the Restatement "has been to present the act of state doctrine as broader in scope, more general in application, more preclusive of international law, and less susceptible of limitation than is warranted by governing authority." Leigh, *Sabbatino's Silver Anniversary and the Restatement: No Cause for Celebration*, 24 Int'l Law. 1, 13–14 (1990). *See also* Olmstead, *Special Review Essays: The Restatement (Third) of the Foreign Relations Law of the Unit-* *ed States—Jurisdiction*, 14 Yale J. Int'l L. 468, 481–82 (1989).

In 1976, Congress enacted the Foreign Sovereign Immunities Act (the FSIA). *See* 28 U.S.C. §§ 1602–1611 (1988). As noted by Professor Hans Smit, the FSIA represented "an attempt at comprehensive statutory regulation of jurisdictional immunities of foreign states and their agencies and instrumentalities." Smit, *The Foreign Sovereign Immunities Act of 1976: A Plea For Drastic Surgery, reprinted in* American Society of International Law, Proceedings of the 74th Annual Meeting 49, 49 (1980).

According to the Report of the Judiciary Committee of the House of Representatives, the FSIA was enacted "to provide when and how parties can maintain a lawsuit against a foreign state or its entities in the courts of the United States and to provide when a foreign state is entitled to sovereign immunity." H.R.Rep. No. 1487, 94th Cong., 2d Sess. 6, *reprinted in* 1976 U.S.Code Cong. & Admin.News 6604, 6604. The House Report also notes that the FSIA was intended to codify the principle of international law that a sovereign state is entitled to immunity only for *jure imperii*, its public acts, but not for *jure gestionis*, its commercial or private acts. *See id.* at 7, 1976 U.S.Code Cong. & Admin.News at 6605.

> The FSIA provides that:
>
> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case ... in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States....

28 U.S.C. § 1605(a)(2) (1988). Under the FSIA, a "commercial activity carried on in the United States by a foreign state" is defined as a "commercial activity carried

on by such state and having substantial contact with the United States." 28 U.S.C. § 1603(e) (1988).

In this case, Nelson contends that the district court has subject matter jurisdiction under the first clause of section 1605(a)(2), since "the action is based upon a commercial activity carried on in the United States by the foreign state...." More specifically, Nelson states that "[t]he arbitrary prolonged detention and the physical torture of Mr. Nelson ... is based directly upon the recruitment activity carried on in the United States by agents of Saudi Arabia."

In order to conclude that there is subject matter jurisdiction under the first clause of section 1605(a)(2), the court must find that Saudi Arabia's recruitment and hiring of Nelson, in the United States, was a "commercial activity," within the meaning of the FSIA. The FSIA provides that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d) (1988). *See also De Sanchez v. Banco Central de Nicaragua,* 770 F.2d 1385, 1391 (5th Cir.1985).

Citing *Zedan v. Kingdom of Saudi Arabia,* 849 F.2d 1511 (D.C.Cir.1988), Saudi Arabia asserts that the mere recruitment of an employee in the United States is an insufficient contact on which to base subject matter jurisdiction under the FSIA. In *Zedan,* the plaintiff, while in the United States, received a phone call recruiting him to work on a project in Saudi Arabia for a company which was not an agency of the Saudi government. *See id.* at 1512. After the plaintiff had worked on the project for two different companies for approximately three years, the project was taken over by an agency of the Saudi government. Several months later, after completing his employment but without receiving total payment, the plaintiff returned to the United States. The plaintiff then sued Saudi Arabia, seeking money due him under his contract of employment. The district court granted Saudi Arabia's motion to dismiss. *See id.*

On appeal, the Court of Appeals for the District of Columbia Circuit agreed that the district court lacked subject matter jurisdiction, and affirmed. In its jurisdictional analysis under the first clause of section 1605(a)(2), the court stated that the phone call recruiting the plaintiff was merely a "preliminary step" or a "precursor" to a commercial transaction. *See id.* at 1513. Hence, the court concluded that "[t]he link between a recruitment phone call in [the United States] and the [intervention of the Saudi government] two-and-one-half years and two employers later is, in our view, too attenuated to constitute a 'direct causal connection.'" *Id.* at 1514.

█ In the present case, however, it is clear from the record that the recruitment and hiring of Nelson, in the United States, was part of a process having "substantial contact with the United States." The recruitment was conducted by the Hospital Corporation of America (HCA), which in 1973 contracted with the Royal Cabinet of the Kingdom of Saudi Arabia to recruit employees for the Hospital. HCA, a corporation organized under the laws of the Grand Cayman Islands, is the wholly owned subsidiary of an American corporation. The contract created an agency relationship between HCA and Saudi Arabia. Under the contract, HCA was empowered to "recruit and employ administrative, nursing, technical, maintenance and all other personnel with full authority to initially set and subsequently adjust their salaries and other remuneration, to supervise such employees, and in its sole judgment, to terminate the employment of any such personnel." In addition, the contract expressly provides that all "employment contracts will be between [Saudi Arabia] and the employee, but may be executed for [Saudi Arabia] by HCA as agent." The contract also states that "[a]ll expatriate personnel recruited must be acceptable to [Saudi Arabia] which acceptability shall be evidenced by issuance of an entrance visa."

On the facts presented we agree with Nelson that the recruitment and hiring in the United States constituted a "commercial activity" of Saudi Arabia, within the meaning of the FSIA. Nevertheless, in order to establish subject matter jurisdic-

tion under the FSIA, the court must also conclude that the detention and torture of Nelson, in Saudi Arabia, were "based upon" Nelson's recruitment and hiring in the United States.

■ Judicial authority reveals that a claim is "based upon" the commercial activity of a foreign state when there is a "jurisdictional nexus" between the acts for which damages are sought, and the foreign sovereign's commercial activity.

For example, in *Vencedora Oceanica Navigacion, S.A. v. Compagnie Nationale Algerienne de Navigation*, 730 F.2d 195 (5th Cir.1984), the plaintiff, the owner of a vessel, sued the defendants, an agent of the Algerian government and the Republic of Algeria, to recover for the loss of the vessel. The district court granted the defendant's motion to dismiss. On appeal, the plaintiff asserted subject matter jurisdiction under the first clause of section 1605(a)(2). *See id.* at 199.

The court in *Vencedora* noted that the courts had varying interpretations of the jurisdictional reach of the first clause of section 1605(a)(2). *See id.* at 199–200. After reviewing four different formulations of the jurisdictional scope of the first clause of section 1605(a)(2), the court adopted the nexus approach. Under the nexus view or requirement, there is subject matter jurisdiction if there is a "nexus" between the acts giving rise to liability, and the commercial activity carried on by the foreign state in the United States. *See id.* at 202. *See also De Sanchez*, 770 F.2d at 1391 (subject matter jurisdiction under section 1605(a)(2) requires a "jurisdictional nexus with the United States").

In addition, the Court of Appeals for the Ninth Circuit has held that there is subject matter jurisdiction under the first clause of section 1605(a)(2) if there is "a nexus between the defendant's commercial activity in the United States and the plaintiff's grievance." *America West Airlines, Inc. v. GPA Group, Ltd.*, 877 F.2d 793, 796 (9th Cir.1989). Similarly, the Court of Appeals for the Third Circuit has stated that "[i]t is essential that there be a nexus between the plaintiffs' grievance and the sovereign's commercial activity." *Velidor v. L/P/G*

*Benghazi*, 653 F.2d 812, 820 (3d Cir.1981). *Cf. Gould, Inc. v. Pechiney Ugine Kuhlmann*, 853 F.2d 445, 452 (6th Cir.1988) (subject matter jurisdiction under section 1605(a)(2) requires "a connection" between the commercial activity and the act complained of in the suit).

■ This jurisdictional nexus requirement between the act complained of or grievance, and the commercial activity or business enterprise conducted by the foreign state is salutary and necessary to satisfy both the congressional policy of the FSIA and sound principles of comity. The nexus requirement implies a bond or link that connects the foreign state to the wrongful act for which it is sought to be held liable. It is comparable to the requirement that there be a causal connection in order to impose liability in the civil law of torts. The jurisdictional nexus requirement of the FSIA finds a domestic parallel in the requirement of a nexus in the application of long-arm statutes. *See, e.g., American Express Int'l, Inc. v. Mendez-Capellan*, 889 F.2d 1175, 1178–79 (1st Cir. 1989).

Saudi Arabia contends that the district court lacks subject matter jurisdiction under the FSIA since Nelson's claims "are based upon the governmental exercise of police power in a foreign country." Saudi Arabia asserts that "[t]he claims are based upon the acts of the Saudi police and prison officials—'governmental' acts beyond the reach of the commercial activity exception."

In support of its contention, Saudi Arabia cites *Arango v. Guzman Travel Advisors Corp.*, 621 F.2d 1371 (5th Cir.1980). In *Arango*, the plaintiffs contended that they suffered injuries when their vacation tour, which was sponsored in part by the defendant, the national airline of the Dominican Republic, was terminated. The plaintiffs asserted that, because their names were on a list of undesirable aliens, upon their arrival in the Dominican Republic immigration officials denied them entry into the country, "man-handled" them, and "involuntarily re-routed" them to the United States. *See id.* at 1373. The plaintiffs

sought damages under breach of contract and several tort claims, including false imprisonment and battery. The district court granted the defendant's motion to dismiss on all claims. *See id.* at 1374.

The Court of Appeals for the Fifth Circuit dismissed the appeal because, under Rule 54(b) of the Federal Rules of Civil Procedure, the order granting the defendant's motion to dismiss was not a final order. *See id.* at 1377–78. Notwithstanding its dismissal of the appeal on separate procedural grounds, the court of appeals discussed the applicable substantive law, and, "in the interest of expediency, proceed[ed] to offer [the district] court some guidance in its further handling of these issues." *Id.* at 1378. The court considered whether there was subject matter jurisdiction, under the first clause of section 1605(a)(2), for the claims of false imprisonment and battery. The court stated that in "man-handling" the plaintiffs during the denial of their entry into the country, the defendant "acted merely as an arm or agent of the Dominican government in carrying out this assigned role, and, as such, is entitled to the same immunity from any liability arising from that governmental function as would inure to the government, itself." *Id.* at 1379. The court, however, concluded that the defendant's actions which gave rise to the claims for breach of warranty and breach of contract were connected to the defendant's commercial activity. Hence, the district court would have had subject matter jurisdiction over these claims under section 1605(a)(2) of the FSIA. *See id.* at 1379–80.

Saudi Arabia also cites *Gregorian v. Izvestia*, 871 F.2d 1515, 1521–22 (9th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 237, 107 L.Ed.2d 188 (1989). In *Gregorian,* the plaintiffs brought suit against the defendant *Izvestia,* a newspaper of the Soviet government, contending that they were libelled by an article published in *Izvestia* which, according to the plaintiff, was written and published so that agencies of the Soviet government could "avoid contractual obligations to plaintiffs resulting from alleged promises to pay for medical equipment transported to the Soviet Union by plaintiffs." *Id.* at 1516. The plaintiffs contended that the libel was a "commercial activity," within the meaning of the FSIA, since it "was published with the *purpose* of injuring plaintiffs by avoiding commercial obligations." *Id.* at 1521 (emphasis in original). The court noted that, under the FSIA, the court must look to the "nature" of the activity at issue, rather than its purpose. *See id.* (citing 28 U.S.C. § 1603(d)). The court found that because *Izvestia* articles are " 'official commentary of the Soviet government,' " publishing and writing them " 'constitutes an activity whose essential nature is public or governmental.' " *Id.* (quoting *Yessenin–Volpin v. Novosti Press Agency,* 443 F.Supp. 849, 856 (S.D.N.Y.1978)). Hence, the libel claim was dismissed for lack of subject matter jurisdiction under section 1605(a)(2). *See id.* at 1522.

In the case of Nelson, however, we find that the detention and torture of Nelson are so intertwined with his employment at the Hospital that they are "based upon" his recruitment and hiring, in the United States, for employment at the Hospital in Saudi Arabia. In his complaint, Nelson alleged that, in the course of his duties, he discovered safety hazards at the Hospital and that he reported these hazards to an investigative body of the Saudi government. Nelson further asserted that as a result of those actions, "[h]e was summoned ... by agents or employees of [the Hospital] to the [H]ospital's security office from which he was transported to a jail cell, shackled, tortured and beaten by agents or employees of SAUDI ARABIA...."

Unlike the facts in *Arango,* in this case the actions of Saudi Arabia resulted from and were directly attributable to Nelson's employment. Furthermore, the Hospital's job description for monitoring systems engineer, the specific position for which Nelson was recruited and hired in the United States, including recommending modifications to existing equipment. The Hospital's job description also states that a monitoring systems engineer "[a]ssures compliance with safety regulations[,]" and "[t]roubleshoots problems and implements

**1536**

corrective action." Hence, detecting and reporting safety violations at the Hospital was a required employment duty for the position for which Nelson was recruited and hired in the United States.

Saudi Arabia, however, asserts that the actions taken against Nelson were the result of Nelson's submission of a false diploma from the Massachusetts Institute of Technology in his application for employment. In making this argument, Saudi Arabia in effect admits the nexus between Nelson's recruitment in Florida and his detention and torture in Saudi Arabia, and supports Nelson's claim of subject matter jurisdiction.

There is also a separate question as to whether the district court properly dismissed Nelson's claim against Royspec. Nelson asserts that Royspec, an instrumentality of the Saudi government, is within the subject matter jurisdiction of the court, under the FSIA, since it "was directly involved in the recruitment of Mr. Nelson."

 It is undisputed that Royspec, derived from Royal Specialist Purchasing Services, was founded by the Hospital in 1979. It is also undisputed that Royspec maintains an office in Maryland, and acts as the purchasing agent for the Hospital, in the United States. Furthermore, Nelson was given the phone number of Royspec's Maryland office so that his family could contact him, while he was in Saudi Arabia, in the event of an emergency. We also note that four telegrams, all of which acknowledge Nelson's employment, contain the telex designation "ROSPEC," which, according to Nelson, may be the designation for Royspec. Although Saudi Arabia denies that the designation "ROSPEC" represents Royspec, on the record before the court and under the FSIA, we conclude that Royspec is within the subject matter jurisdiction of the court.

Finally, our holding is not based upon the act of state doctrine but on the interpretation and application of the FSIA. On the facts presented we hold that the district court erred in determining that it did not have subject matter jurisdiction.

## CONCLUSION

Since we conclude that, on the facts presented, the recruitment and hiring of Nelson in the United States was a "commercial activity" of the Saudi government, and that Nelson's subsequent detention and torture were "based upon" Nelson's recruitment and hiring in the United States, the district court erred in determining that there was no subject matter jurisdiction under the FSIA. Accordingly, we REVERSE the judgment of the district court, and REMAND the case.