United States Court of Appeals,

Fifth Circuit.

Nos. 91–6156, 91–6222.

TUBULAR INSPECTORS, INC., Plaintiff–Appellee,

v.

PETROLEOS MEXICANOS d/b/a Refineria Salina CRUZ OAXACA, Defendant–Appellant.

TUBULAR INSPECTORS, INC., Plaintiff–Appellee,

v.

PETROLEOS MEXICANOS a/k/a Pemex, d/b/a Refineria Salina Cruz Oaxaca, Defendant–Appellant.

Nov. 16, 1992.

Appeals from the United States District Court for the Southern District of Texas.

Before JONES and WIENER, Circuit Judges, and LITTLE, District Judge.[1]

EDITH H. JONES, Circuit Judge:

This court has had several occasions recently to consider interlocutory appeals of district court orders denying motions by Mexico's national oil company, Petroleos Mexicanos (Pemex), to dismiss various actions for lack of subject matter jurisdiction under the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1330, 1601–11.[2] Once again, we are called upon to consider such an order, and although the facts of this latest appeal are unrelated to those at issue in our previous decisions, "the task [of interpreting the FSIA] is no easier now than it has been before." *Stena,* 923 F.2d at 382. The underlying claims brought against Pemex by an American Company, Tubular Inspectors, Inc. (Tubular USA), sound in contract and tort law. Besides disputing the applicability of the "commercial activities" exception to sovereign immunity, *see* § 1605(a)(2),[3] Pemex argues in

---

[1]District Judge of the Western District of Louisiana, sitting by designation.

[2]*See Arriba Ltd. v. Petroleos Mexicanos,* 962 F.2d 528 (5th Cir.1992); *United States v. Moats,* 961 F.2d 1198 (5th Cir.1992); and *Stena Rederi A.B. v. Comision de Contratos,* 923 F.2d 380 (5th Cir.1991).

[3]Section 1605 provides in relevant part:

the alternative that the district court's exercise of personal jurisdiction over Pemex violates due process, and that the doctrine of *forum non conveniens* compels dismissal of the case. Concluding that the district court erred in finding jurisdiction under the FSIA, we reverse.

## I.

## BACKGROUND

Tubular USA sued Pemex in federal district court at Corpus Christi, Texas, for breach of contract and conversion. The disputed transaction began when Pemex agreed to purchase certain valves from Tubular USA's Mexican subsidiary, Inspectores Tubulares (Tubular Mexico), for one of Pemex's oil refineries in Oaxaca, Mexico known as the Salina Cruz Refinery. Tubular USA contends that Pemex contracted to buy a total of 19 valves, yet paid for only 15 of them. Pemex contends that it presented two non-negotiable cashier's checks for the unpaid balance, payable in pesos to Tubular Mexico, to two men, Juan Pablo Castilleja and Angel Belmudes Chavez, who claimed to be Tubular Mexico employees. Tubular USA asserts that Castilleja and Belmudes were not authorized by it or its Mexican subsidiary to receive the checks in question, adding that it has no idea who these "employees" were.[4]

---

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
>
>> (2) *In which the action is based upon a commercial activity carried on in the United States by the foreign state;* or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.
>
> 28 U.S.C. § 1605(a)(2) (emphasis added). Under the FSIA, foreign states and their agencies and instrumentalities are immune from suit in the courts of the United States except as otherwise provided in the Act. 28 U.S.C. § 1604. A failure to satisfy the statute's exceptions deprives the district court of subject matter jurisdiction. *See Walter Fuller Aircraft Sales v. Rep. of Philippines,* 965 F.2d 1375 (5th Cir.1992).

[4]At this stage of the litigation, the exact circumstances of nonpayment for the valves are not clear. However, the briefs of the parties and the record developed by the district court suggest a conspiracy, possibly involving Pemex officials, to pocket the money that Pemex allegedly paid for the four valves listed in Purchase Order No. 1054. According to Pemex, Castilleja and Belmudes "held themselves out as Tubular Mexico's attorneys-in-fact, acting under a power of attorney ... written on Tubular Mexico's letterhead." The two men managed to cash the checks at Tubular Mexico's bank in Mexico, in violation of Mexican law. They then allegedly used the proceeds to

While the parties agree on many of the essential facts, each characterizes the sale differently. Pemex contends that the transaction arose, occurred and ended in Mexico. The oil company also insists that it contracted only with Tubular Mexico so as to comply with Mexican law requiring it to enter into commercial agreements exclusively with companies registered to do business in Mexico. Pemex paid for all 19 of the valves by issuing non-negotiable checks to Tubular Mexico, payable in pesos and drawn on, deposited in, and cashed by Mexican banks.

Tubular USA concedes that representatives of Pemex's Salina Cruz Refinery sent written solicitations to Tubular Mexico in February 1987 for bids on possible sales of the valves. However, appellee emphasizes that neither it nor Tubular Mexico had any direct contact with Pemex until the oil company issued three purchase orders, addressed to Tubular Mexico's office in Reynosa, Tamaulipas, Mexico, in the name of "Tubular Mexico and/or Tubular Inspectors, USA." The three orders, by which Pemex purported to purchase all 19 valves, included Purchase Order No. 1054.[5] All 19 valves were of U.S. origin, and Tubular USA purchased them in the United States. As a condition of sale, Tubular USA maintains that it required Pemex to accept delivery of the valves in Houston, with the sale invoiced directly to Pemex. After receiving the three purchase orders, Tubular USA purchased the specified equipment from U.S. suppliers and notified Pemex of its availability for inspection and delivery in Houston.[6] Invoice No. 4983, prepared by Tubular USA on its letterhead, covered the four valves listed in Purchase Order No. 1054 and states in Spanish: "These products have been delivered, received, and accepted in Houston, Texas ... these products will be exported to Mexico before 8/31/87." Invoice No. 4983 purportedly bears Pemex official Banda's initials.

---

purchase a money order payable to Jose Montalva Banda, who at the time served as counsel to the assistant for Pemex's central administrative office. Banda is the uncle of Frederico Montalvo Robles, the then general superintendent of the Salina Cruz refinery. According to Pemex, Mexico's Attorney General is now conducting a criminal investigation into the alleged conspiracy.

[5]Pemex acknowledges the validity of Purchase Orders No. 1053 and No. 1055 but alleges that No. 1054 is invalid because of an insufficient number of authorized signatures. The parties' dispute over the validity of No. 1054 is irrelevant to our decision.

[6]Pemex maintains an office in Houston primarily for the purchase of U.S. equipment needed for its Mexican operations. It is undisputed that Pemex's Houston office never contracted with Tubular USA or otherwise participated in this transaction.

According to Tubular USA, the sale was completed on July 13, 1987, when Pemex officials inspected and purported to accept the valves at a meeting in Houston, Texas.[7]

Almost contemporaneously with these events in Texas, Pemex was nominally following Mexican law, which mandated its procurement of the valves *only* from a Mexican supplier and *only* after a competitive bidding process. Pemex thus received Tubular Mexico's "bid" for the valves on August 19 and later bids from other would-be suppliers, even though the Tubular USA valves were imported to Mexico on August 25.[8] A Mexican import/export agent billed $28,000 to "Tubular Mexico and/or Tubular USA" at Tubular Mexico's address for all customs charges and taxes as of that date. At the conclusion of the alleged competitive bidding process, Tubular Mexico invoiced Pemex for the four contested valves in December 1987. Pemex issued its checks in December, apparently in response to Tubular Mexico's invoice. The checks were made to the order of Tubular Mexico, nonnegotiable and payable in pesos. Tubular USA contends that neither it nor Tubular Mexico ever received the $234,000 balance owed by Pemex.

II.

SUBJECT MATTER JURISDICTION

The district court based subject matter jurisdiction over Pemex on the first clause of § 1605(a)(2), which exempts from claims of sovereign immunity actions "based upon a commercial activity carried on in the United States by the foreign state."[9] As defined elsewhere in the FSIA, "

---

[7]According to an affidavit by Robert Gough, Executive Vice President of Tubular USA, Banda, Robles and Miguel Angel Andrade, Engineer and Chief of Maintenance at the Salina Cruz Refinery, met in Houston to discuss the deal. Gough also claims to have met in Corpus Christi with Robles between August 14 and August 17, 1987. Pemex dismisses Gough's affidavit as "conclusory," adding that the affidavit provides no other information about the substance of these meetings.

[8]The district court agreed with Tubular USA that the timing of the bidding process was "suspicious," citing "the almost contemporaneous inspection, acceptance, and request for delivery by Pemex in Houston and the subsequent importation of the valves into Mexico, while a national bidding procedure designed to insure the integrity and cost-efficiency of the valve purchased by Pemex was in progress...."

[9]Neither party argues to this court subject matter jurisdiction may be based on the other two clauses of § 1605(a)(2), which exempt from sovereign immunity acts performed in the United States by the foreign state in connection with commercial activity elsewhere, as well as extraterritorial acts of the foreign state that have a direct effect on the United States. *See e.g.,*

"commercial activity carried on in the United States by a foreign state' means commercial activity carried on by such states and having substantial contact with the United States."  28 U.S.C. § 1603(e).  Pemex does not dispute that it engaged in commercial activity with Tubular Mexico in this transaction, but it strenuously disputes that Tubular USA's claims are based upon commercial activity that occurred in the United States.  This court recently held that the jurisdictional nexus requirement of § 1605(a)(2) mandates not only that Pemex's commercial acts be tied to the United States, but that they form the basis of Tubular USA's causes of action.  *Stena,* 923 F.2d at 386–88.  This "nexus test" does not require a direct causal relationship between the foreign state's commercial acts and the plaintiff's lawsuit.  *Id.* at 387.  On the other hand, "[i]solated or unrelated commercial actions ... do not authorize the exception."  *Arriba,* 962 F.2d at 532.[10]  Such an argument did not impress the district court, which found substantial contacts between Tubular USA's cause of action and Pemex's commercial dealings in the United States.  The district court wrote:

> Although the act of non-payment did not occur in the United States, the goods were ordered from an American company in its name;  there was an inspection of those goods in the United States;  there was acceptance of those goods in the United States, and a further request for shipment to Mexico;  delivery was accomplished as requested;  an American invoice was sent by a permissible addressee of the purchase order;  and payment may well have not been made.  In conclusion, the Court holds that there is adequate jurisdictional nexus between the

---

*Republic of Argentina v. Weltover, Inc.,* —— U.S. ——, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992).

[10]Pemex urges us to abandon the imprecise nexus test that our cases have invoked to construe whether an action is based upon a commercial activity carried on in the United States by the foreign state.  *See, e.g., Vencedora Oceanica Navigacion, S.A. v. Compagnie Nationale Algerienne de Navigation,* 730 F.2d 195, 200 (5th Cir.1984).  Not only is this panel unable to overrule controlling circuit authority, but in this case the "nexus test" has been adopted by other circuits.  *See Velidora v. L/P/G Benghazi,* 653 F.2d 812, 820 (3d Cir.1981);  *Gould v. Pechiney Ugine Kuhlmann,* 853 F.2d 445, 452 (6th Cir.1988);  *American West Airlines, Inc. v. GPA Group, Ltd.,* 877 F.2d 793, 796 (9th Cir.1989).  *But cf. Santos v. Compagnie Nationale Air France,* 934 F.2d 890, 892–94 (7th Cir.1991);  and *Gilson v. Rep. of Ireland,* 682 F.2d 1022, 1027 (D.C.Cir.1982).  Another good reason for not straying further into this thicket of statutory interpretation and gloss is that the Supreme Court will this term hear argument in a case allegedly decided under the "nexus test."  *Nelson v. Saudi Arabia,* 923 F.2d 1528, 1534 (11th Cir.1991), *cert. granted,* —— U.S. ——, 112 S.Ct. 2937, 119 L.Ed.2d 562 (1992).  In *Nelson,* the plaintiff was recruited by an advertisement to work in a Saudi-owned hospital in Saudi Arabia.  While there, he reported safety violations and was, in retaliation, held prisoner, tortured and beaten.  Back in the U.S., he sued Saudi Arabia, the hospital and its government-owned purchasing agent.  The Eleventh Circuit found a "nexus" between Saudi Arabia's commercial activity of advertising in this country and Nelson's detention and torture, which were "based upon" his being hired here. 923 F.2d at 1536.

commercial activity and plaintiff's complaint.

It is our duty to review the district court's conclusions about sovereign immunity *de novo. Walter Fuller,* 965 F.2d at 1383.[11] Based on the uncertain status of Pemex's Purchase Order No. 1054, the fact that "acceptance" and delivery of the valves to Mexico strangely preceded Pemex's formal bid procedure, and the parallel invoices issued by Tubular USA and Tubular Mexico, there is plainly room for legitimate disagreement as to (1) whether Pemex's purchase transaction amounted to commercial activity *carried on in the United States,* and (2) whether Tubular USA's claim was "based upon" that activity. Having considered the matter carefully, however, we must disagree for several reasons with the district court's characterization of the transaction, and with its conclusion that FSIA jurisdiction exists.

First, the district court made too much of the fact that Pemex addressed its order to Tubular Mexico "and/or" Tubular USA. All of the sales documentation was in Spanish, all of it was addressed to Tubular Mexico's Reynosa address, and Pemex only sent representatives to Houston when specifically asked to do so by Tubular USA. Pemex's efforts to comply with the letter (if not the spirit) of Mexican law, by purchasing through a Mexican supply company and seeking competitive bids, and by making payment to the Mexican company in pesos in Mexico, should not lightly be disregarded. That Tubular Mexico and Tubular USA were joint addressees is not inconsistent with Pemex's attempt to craft a Mexican transaction.

Second, the district court misperceived the significance of Pemex's inspection and acceptance of the valves in the United States. While it made some sense for Pemex officials to verify before shipment to Mexico that $234,000 in industrial valves conformed to their specifications, it was clearly imperative for Tubular USA to gain Pemex's early approval. Tubular USA did not want to risk sending its valuable property to Mexico only to have it held up there for nonconformity with the contract. "Acceptance" by Pemex in this context meant only that the goods met the purchaser's

---

[11]Once it was argued that Pemex is a "foreign state," *see Stena,* 923 F.2d at 386 n. 7, Tubular USA had to produce some facts to show that the commercial activity exception to immunity applies. *Arriba,* 962 F.2d at 533. Nonetheless, Pemex "retains the ultimate burden of proof on immunity." *Id. See also Forsythe v. Saudi Arabian Airlines Corp.,* 885 F.2d 285, 289 n. 6 (5th Cir.1989).

technical requirements. Acceptance did not connote, as the district court may have believed, that Tubular had completed performance or was free of subsequent claims. Our conclusion is borne out by Tubular Mexico's or Tubular USA's having been responsible for paying the customs agent and for "nationalizing" the valves by importation to Tubular Mexico's home town of Reynosa. Tubular clearly continued to have responsibility for the valves until they were delivered to the Salina Cruz refinery.

Third, invoices for the valves represented in Purchase Order No. 1054 were sent both by Tubular USA and Tubular Mexico to Pemex, and payment was not made until after Tubular Mexico had submitted invoices, which occurred several months after Tubular USA sent its invoices. Further, the Pemex payments conformed to the 50% "advance"/50% "completion" mode requested only by Tubular Mexico, and they were directed to Tubular Mexico through its Mexican banks. The inescapable inference from this sequence of events, corroborated by the way in which Pemex paid for valves covered by Purchase Orders No. 1053 and 1055 in the face of similar duplicate invoices, is that Pemex intended to and did pay Tubular Mexico.

Fourth, not only is the jurisdictional nexus between Pemex's commercial activity and the United States insubstantial, but, as the district court acknowledged, there is no direct nexus between Pemex's meetings in this country and the breach of contract or conversion claims. Two mysterious Mexican individuals walked off with the proceeds of Pemex checks that only Tubular Mexico should have been permitted to cash and then only at its bank in Mexico. We do not hold that by itself, the occurrence on foreign soil of a cause of action arising from a sovereign's commercial activity in this country precludes domestic jurisdiction under the first clause of § 1605(a)(2). The contrary would often be true. *See Santos v. Compagnie Nationale Air France,* 934 F.2d 890, 892–94 (7th Cir.1991). Here, however, the check was not even payable to an American entity, and the circumstances of its disappearance easily raise suspicions beyond simple malfeasance by Pemex.

While "[a] single contract or course of dealing executed within this nation's boundaries typically will constitute commercial activity carried on in the United States," *Stena,* 923 F.2d at 389 n. 11, and while this case presents a closer FSIA jurisdictional issue than others we have recently

decided,[12] we conclude that Pemex's contacts with Tubular USA in Texas were sufficiently isolated to deny subject matter jurisdiction. Pemex purposefully structured the transaction to anchor it in Mexico. Tubular USA deliberately created Tubular Mexico to facilitate compliance by Mexican entities like Pemex with Mexican law that required them to purchase from "local" concerns. Tubular USA's intervention was not sought by Pemex, which continued to deal directly only with Tubular's Mexican affiliate. The acts that form the basis of appellee's cause of action for non-payment did not occur in the United States. *See Stena,* 923 F.2d at 387–88. This result prevents Tubular USA from jurisdictionally having its cake and eating it, by doing business through a Mexican subsidiary as Mexican law requires but seeking to avoid the consequences of that choice when it comes time to sue for the purchase price of the valves.[13]

### III.

### CONCLUSION

Pemex has also moved to dismiss on the grounds that the exercise of personal jurisdiction over it by the district court would violate due process. In light of the foregoing discussion, we need

---

[12]In *Arriba, supra,* the plaintiff, a Bahamian corporation that had allegedly contracted with Pemex's labor union to purchase the company's residual oil, failed to allege *any* commercial activities in the United States, related to the agreement, by or on behalf of Pemex. 962 F.2d at 534. Indeed, the agreement at issue in *Arriba* was deliberately structured by the parties to avoid any direct dealings between Arriba and Pemex; and Pemex was never a party to it. In *United States v. Moats, supra,* the court noted that the original agreement between the parties consisted of a series of Pemex activities performed in the United States, including contracts to purchase U.S.-made steel and inspection trips by Pemex representatives to Pennsylvania prior to shipment. However, the disputed *Moats* litigation arose not from these original contracts, but from the alleged breach of a settlement agreement later executed in Mexico. Because that agreement "functioned as a new contract between the parties," *Moats* concluded that the plaintiff could not demonstrate the required material connection between its cause of action and Pemex's commercial activities in the United States. 961 F.2d at 1206. Finally, *Stena,* heavily relied upon by both parties for its statement of the governing legal principles, is inapposite on the facts. Pemex was not directly connected to the dispute between a Mexican shipping company and a Swedish supplier to the company. 923 F.2d at 389.

[13]In *Santos, supra,* the Seventh Circuit, in discussing this clause of § 1605(a)(2), noted that if a U.S. citizen purchased an airline ticket outside this country, the fact that he was a U.S. citizen does not confer jurisdiction. 934 F.2d at 894. Similarly, in this case, we have concluded that Tubular USA cannot find jurisdiction on its citizenship plus one visit of Pemex officials, where it organized a Mexican entity specifically to do business in Mexico and the contract was structured as between two Mexican companies.

not address that question[14] nor do we decide the applicability of the *forum non conveniens* doctrine.

The judgment of the district court is REVERSED with instructions to DISMISS with prejudice.

. . . . .

---

[14]The Supreme Court has reserved deciding whether a foreign sovereign may be a "person" under the Fifth Amendment's due process clause. *Republic of Argentina v. Weltover, Inc.,* —— U.S. at ——, 112 S.Ct. at 2169.