# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-1816

_____

| | |
|---|---|
| Community Finance Group, Inc.; <br> Andrew Vilenchik, <br><br>          Appellants, <br><br> v. <br><br> Republic of Kenya; Kenya Revenue <br> Authority; Kenya Department of <br> Customs; Kenya Central Bank, <br><br>          Appellees. | Appeal from the United States <br> District Court for the <br> District of Minnesota. |

_____

Submitted: November 15, 2011
Filed: December 15, 2011

_____

Before WOLLMAN, MURPHY, and BENTON, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Community Finance Group, Inc. and its general manager Andrew Vilenchik (collectively referred to as "CFG" or "plaintiffs"), appeal the district court's[1] dismissal of their claims for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure. Because the Foreign Sovereign Immunities Act of

_____

[1]The Honorable David S. Doty, United States District Judge for the District of Minnesota.

1976 (FSIA), 28 U.S.C. §§ 1330, 1602 *et seq.*, applies to all defendants and no exception to sovereign immunity exists in this case, we affirm.[2]

I.

According to CFG's amended complaint, in October of 2008, Vilenchik commenced discussions with John Saina, a United States citizen and former Kenyan national who previously worked for the Kenyan police, concerning opportunities for purchasing gold for CFG. Saina explored such opportunities in Kenya on CFG's behalf. CFG ultimately contracted with Zilicon Freighters, Ltd. to purchase 300 kilograms of gold for $6 million. CFG and Zilicon, through representative Illunga Ngoei (Illunga), agreed that CFG would establish a $350,000 escrow account with Miller & Company to cover Kenyan taxes, customs fees, and storage associated with the transaction. Later, CFG instead wired the $350,000 to a bank account of Great Lakes Auto Tech Int'l Ltd. (Great Lakes), a holding company of Zilicon, apparently to expedite customs payments and export. CFG and Great Lakes facilitated the transfer through Bay Forex Bureau, a Kenyan-licensed foreign exchange bureau.

The Kenya Central Bank verified the $350,000 transaction on June 16, 2009. The next day, Paul Kazungu, a Kenyan customs officer, informed CFG that a permit from the United Nations was necessary before the gold could be released for export. On June 18, 2009, two individuals claiming to be officials with the Nairobi United Nations office told CFG that the gold derived from a consignment confiscated by Kenyan customs officials that also contained diamonds and that CFG would be required to purchase the entire consignment. CFG became suspicious, retained a Kenyan lawyer, and filed a complaint with the Kenya Central Bank Fraud Investigations Department (BFID). Police then arrested Illunga.

---

[2]Defendants argue that dismissal also is proper under the pleading standard set forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009). In light of the lack of subject matter jurisdiction, we need not take a position on this contention.

On June 26, 2009, Kenyan police brought CFG representatives to the customs office at Kenyatta International Airport, where the representatives were informed that the gold had been removed from the airport and was being stored at the Kenya Central Bank. During the BFID investigation, various currency, check cards, and bank statements of Illunga were seized, and ten of Illunga's Kenyan bank accounts were frozen. In February of 2010, the Kenyan police informed CFG that Illunga's prosecution had been put on hold. This was CFG's last communication with the Kenyan police. None of CFG's $350,000 has been returned, and CFG never received any gold. In addition, plaintiffs have discovered that the Kenyan attorney they retained also represents the Kenya Central Bank.

CFG brought suit against the Republic of Kenya, Kenya Revenue Authority, Kenya Department of Customs, and Kenya Central Bank for breach of duty, improper taking in violation of international law, conversion, conspiracy to commit a tort, aiding and abetting an improper taking and fraudulent scheme, and unjust enrichment. Following defendants' motion to dismiss, the district court dismissed the action for lack of subject matter jurisdiction.

## II.

"We review *de novo* questions of subject matter jurisdiction." Wells Fargo Bank, N.A. v. WMR E-Pin LLC, 653 F.3d 702, 705 (8th Cir. 2011) (citing Sac & Fox Tribe v. Bureau of Indian Affairs, 439 F.3d 832, 835 (8th Cir. 2006)). "We must accept all factual allegations in the pleadings as true and view them in the light most favorable to the nonmoving party." Hastings v. Wilson, 516 F.3d 1055, 1058 (8th Cir. 2008) (citations omitted).

III.

"[T]he FSIA provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 443 (1989); see also 28 U.S.C. §§ 1330(a), 1604. Under the FSIA, a foreign state is "presumptively immune" from the jurisdiction of American courts and "unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993) (citations omitted). The FSIA defines a foreign state as including "a political subdivision of a foreign state or an agency or instrumentality of a foreign state . . . ." 28 U.S.C. § 1603(a).

"Once a foreign state makes a prima facie showing of immunity, the plaintiff seeking to litigate in the United States then has the burden of showing that an exception applies." Gen. Elec. Capital Corp. v. Grossman, 991 F.2d 1376, 1382 (8th Cir. 1993) (internal citation omitted). Here, defendants consist of the foreign state of Kenya and agencies or instrumentalities of Kenya. Plaintiffs thus seek to establish jurisdiction under three of the FSIA's enumerated exceptions to sovereign immunity: (1) the commercial activity exception under § 1605(a)(2); (2) the expropriation exception under § 1605(a)(3); and (3) the tort exception under § 1605(a)(5).

A.

The FSIA provides an exception to sovereign immunity in cases "in which the action is based upon . . . an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). When a foreign state acts "not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of [the FSIA]." Gen. Elec.

-4-

Capital Corp., 991 F.2d at 1382 (quoting Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 614 (1992)).

The district court correctly concluded that none of the acts or alleged breaches of duty attributed to defendants were commercial in nature. CFG alleged that the defendants: (1) failed to investigate the underlying commercial transaction between CFG and Zilicon to ensure that it was legitimate; (2) failed to secure the gold stored by customs and place a hold on the funds transferred by CFG until the transaction could be verified; (3) failed to investigate the criminal activities of alleged wrongdoers; and (4) failed to return as restitution funds seized from alleged wrongdoers. Am. Compl. ¶¶ 54-57. The decisions regarding whether or how to investigate an allegedly fraudulent commercial transaction between private parties, regulate exports, enforce criminal laws, and seize property during criminal investigations are governmental rather than commercial activities. See Tucker v. Whitaker Travel, Ltd., 620 F. Supp. 578, 584 (E.D. Pa. 1985) (granting motion to dismiss challenge to Bahamian government's decisions how to regulate tourism industry, police its citizens, and investigate accidents within its borders, because such decisions "are peculiarly governmental and may not be subjected to scrutiny in the United States courts"), aff'd, 800 F.2d 1140 (3d Cir. 1986); World Wide Minerals, Ltd. v. Republic of Kazakhstan, 296 F.3d 1154, 1165 (D.C. Cir. 2002) ("right to regulate imports and exports is a sovereign prerogative") (citations omitted); Nelson, 507 U.S. at 361 ("a foreign state's exercise of the power of its police has long been understood . . . as peculiarly sovereign in nature") (citations omitted); First Merchs. Collection Corp. v. Republic of Argentina, 190 F. Supp. 2d 1336, 1338-39 (S.D. Fla. 2002) ("The seizure of goods by a nation's police force is not the type of action by which a private party engages in trade, traffic or commerce," but rather is "quintessentially sovereign in nature"). As a result, the alleged acts fall outside the scope of the commercial activity exception to sovereign immunity.

B.

Under the FSIA, a foreign state is not immune from jurisdiction in any case:

> [I]n which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.

28 U.S.C. § 1605(a)(3).

The expropriation exception does not apply in this case. Count II of the amended complaint, which asserts a claim for "Improper Taking in Violation of International Law," alleges that defendants "improperly retained monetary funds owned by Plaintiffs" and "improperly retained gold purchased by Plaintiffs." Am. Compl. ¶¶ 61-62. Neither could constitute a taking under the factual allegations in the amended complaint, however, because plaintiffs never paid for or acquired the gold that they allege was taken from them and they do not allege that the $350,000 paid to Great Lakes was ever transferred to defendants. Even if such property had been taken by defendants, CFG still failed to establish that the property is present in the United States or that the expropriating defendants engage in commercial activity in the United States.

C.

The FSIA provides an exception to sovereign immunity in a case in which a plaintiff seeks money damages:

> [F]or personal injury or death, or damage to or loss of property, *occurring in the United States* and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment.

28 U.S.C. § 1605(a)(5) (emphasis added). This exception does not apply to "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function . . . ." § 1605(a)(5)(A). The tort exception covers "only torts occurring within the territorial jurisdiction of the United States," regardless of whether the alleged tort "may have had effects in the United States." Amerada Hess Shipping Corp., 488 U.S. at 441.

Because all the alleged torts would have occurred in Kenya rather than the United States, the tort exception does not apply. The alleged taking or conversion of CFG's funds or gold could have occurred only in Kenya, and CFG's conspiracy allegations expressly state that the conspiracy occurred "within Kenya." Am. Compl. ¶ 70. Although plaintiffs argue that their $350,000 wire transfer constituted an act in the United States, that act was performed by plaintiffs themselves. Plaintiffs also argue that the conspiracy originated in the United States with Saina's acts, but the amended complaint does not allege that Saina was an agent of any defendant.[3]

## IV.

The order of dismissal is affirmed.

_____

---

[3]Furthermore, CFG represented to the district court that "we did not allege -- we have not alleged, nor do we have direct evidence that [Saina] was a -- specific agent of the Kenyan government for purposes of this transaction . . . ." Mot. Hr'g Tr. 15.