**MORGAN EQUIPMENT CO., Plaintiff,**

v.

**NOVOKRIVOROGSKY STATE ORE MINING AND PROCESSING ENTERPRISE, Defendant.**

No. C 94–1231 CW.

United States District Court, N.D. California.

Oct. 13, 1998.

Douglas N. Akay, Akay & Associates, Martin D. Goodman, San Francisco, CA, for Krivoy Rog State Mining–Metalurgical Factory, Plaintiff.

Roderick A. McLeod, Brobeck Phleger & Harrison LLP, San Francisco, CA, for Morgan Equipment Co., defendant.

## ORDER GRANTING DEFENDANT'S RULE 60(B)(4) MOTION

WILKEN, District Judge.

Defendant Krivoy Rog State Mining–Metallurgical Factory, successor-in-interest to Novokrivorogsky State Ore Mining and Processing Enterprise, (the Mine) [1] moves, pursuant to Rule 60(b) of the Federal Rules of Civil Procedure (Fed.R.Civ. P.), for relief from judgment. Plaintiff Morgan Equipment Company (Morgan) opposes the motion. The matter was heard on September 25, 1998. Having considered all of the papers filed by the parties and oral argument on the motion, the Court grants Defendant's motion.

## BACKGROUND

Morgan is a California-based, American corporation engaged in the distribution of construction and mining equipment, supplies, and parts. The Mine is a Ukrainian mining corporation, which is more than fifty percent state-owned and centered in Krivoy Rog, Ukraine.

This case arises out of a series of contracts between Morgan and the Mine. After Harold Morgan, President of Morgan, and Oleg Vasieleyvich Khrapko, General Secretary of the Mine, met in London in 1992, the parties entered into a barter contract later that year. Kerry Donahoe, Morgan's Vice–President, traveled to Krivoy Rog, Ukraine, where he and Khrapko

---

1. The Mine alleges, and Morgan does not contest, that Krivoy is the successor-in-interest to Novokrivorogsky. For purposes of this motion, the Court assumes the truth of this allegation.

negotiated and executed the contract. Morgan delivered machinery to the Mine, in exchange for approximately 60,000 metric tons of iron ore concentrate.

On or about October 23, 1992, Morgan and the Mine entered into a second contract ("Contract 954/93"), which forms the crux of the parties' present dispute. In its final form, Contract 954/93 provided that Morgan would provide the Mine with certain items of equipment in ·exchange for the delivery of 333,000 metric tons of iron ore concentrate. The parties are in substantial disagreement about where negotiations took place, the extent of negotiations, the actual terms of the contract, the events leading up to and constituting the Mine's partial performance, and the subsequent breach of the contract.

Morgan asserts that Contract 954/93 was extensively and entirely negotiated in San Francisco. In anticipation of this contract, Donahoe and Richard McMurray, Morgan's Manager for International and Special Projects, traveled to Ukraine "to gain a better understanding of [the Mine's] operations and its equipment needs." Donahoe Decl. at ¶7. During the trip, Morgan's representatives also pursued business discussions with other mines in the area. Donahoe and McMurray both assert that they met with Khrapko several times to discuss the Mine's equipment, parts, and supplies requirements for the coming year. These discussions resulted in a "Letter of Protocol" that Donahoe and McMurray described as a mere memorialization of the Mine's anticipated needs. Both of these representatives of Morgan state that they had no authority to negotiate a contract for Morgan and that they had not conducted any research regarding availability or prices of the equipment desired by the Mine.

According to Morgan, Khrapko arrived in San Francisco on or about October 13, 1992 with a draft of the contract. Morgan asserts that Harold Morgan and Donahoe discussed each clause of the contract with Khrapko. During these negotiations, Morgan states that the parties raised the price per ton for the iron ore to $19.00, added and deleted items of equipment from Khrapko's list, and changed the quantities of other equipment.

Morgan further contends, and the Mine denies, that the Mine promised that Morgan would receive the Mine's entire export allocation. Contract 954/93, which contains an integration clause, makes no mention of any exclusivity agreement. Morgan states that, in entering into the contract, it relied on this promise.

It is undisputed that the parties jointly attended the MINExpo International '92, a convention for manufacturers and suppliers of industrial and mining equipment and parts. Morgan states that the purpose of this trip to Las Vegas was to allow Khrapko to meet with Morgan's suppliers. Although Morgan asserts that the parties spent considerable time shopping for better prices on equipment, it is uncontested that the terms of Contract 954/93 were not altered as a result of any meetings at the convention.

The final draft of Contract 954/93 was signed on or about October 23, 1992, in San Francisco.

On or about March 29, 1993, the parties entered into two agreements that superseded Contract 954/93. Morgan asserts that these modifications resulted from a directive from the Ukrainian government, and that Morgan only reluctantly consented. One of these two substitute agreements (Contract 328/1) provided that 151,-000 tons of iron ore concentrate would be delivered in exchange for certain equipment. The second substitute agreement (Contract 328/2) provided that 150,000 tons of iron ore concentrate would be delivered in exchange for a cash payment of $2,565,-000. Morgan concedes that these two new contracts were negotiated either by telephone or in Ukraine. Indeed, Morgan states that Donahoe was not provided with an English translation of the documents before signing. Donahoe asserts that he

believed at the time that the new contracts were the substantive equivalent of Contract 954/93.

Morgan maintains that it was prepared in March, 1993, to perform its obligations under Contract 954/93. Morgan further asserts that because the Mine failed to ship the ore as scheduled, the third-party purchaser failed to make payments to Morgan. In addition to substantial consequential damages, Morgan argues that it suffered significant losses by failing to pursue other lucrative business opportunities.[2]

According to Morgan, Contract 954/93 contained a provision stating that disputes arising out of the contract would be arbitrated by a panel located in the country of the non-claimant party. Morgan asserts that when the original contract was replaced by Contracts 328/1 and 328/2, the Mine surreptitiously altered the wording of the arbitration provision to call for arbitration of disputes before the Arbitration Commission of the Chamber of Trade and Commerce in Ukraine.

The Mine presents a story, which, though paralleling Morgan's account in its general outline, differs substantially in several material respects. The Mine states that the overwhelming majority of the negotiations for Contract 954/93 occurred in Ukraine. Khrapko represented the Mine, and Donahoe and McMurray represented Morgan. The Letter of Protocol represented a negotiated partial draft of the contract. The Mine asserts that Contract 954/93, also a barter contract, was a standard contract form used by the Mine. While in Ukraine for negotiations, Donahoe met with representatives from the Bulgarian steel company to whom Morgan eventually sold the ore it received from the Mine.

The Mine further states that, although the contract was sufficiently finalized during the negotiations in Ukraine to complete it by mail, Khrapko invited Harold Morgan to travel to Krivoy Rog for the signing. Morgan declined the invitation due to his poor health, offering instead to pay for all airfare, hotel accommodations, and meals for Khrapko and his wife to come to San Francisco. Khrapko asserts that he accepted this offer even though there was no real business purpose for the trip.

The Mine readily concedes that once Khrapko arrived in San Francisco, the parties made minor alterations to Contract 954/93. The Mine asserts that the total quantity of iron ore it was to deliver and the general contractual terms did not change. The only differences between the draft contract that Khrapko brought with him from Ukraine and the final version of Contract 954/93 were in the quantities of several types of equipment the Mine was to receive and the corresponding price extensions. The parties agree that the final contract was signed in San Francisco.

According to the Mine, the Las Vegas trip that Khrapko and his wife took with representatives from Morgan was not a business trip. Although the parties did attend the MINExpo International '92 convention, no negotiations took place during this excursion and Contract 954/93 was not altered as a result of any events during this trip.

Before the parties had the opportunity to perform Contract 954/93, the Mine states, the Ukrainian Cabinet of Ministers ordered that the contract had to have a currency component. As a direct result of this order, Contract 954/93 was renegotiated and split into two separate contracts.

---

2. Magistrate Judge Brazil found that Morgan had not produced any evidence of the losses incurred as a result of either the Mine's alleged breach or missed business opportunities. Indeed, Judge Brazil stated that Morgan had received a substantial benefit in the form of iron ore valued at approximately $2.3 million. *See* Report and Recommendation of July 18, 1995 at 17–20. In granting default judgment, this Court agreed with Judge Brazil's findings and awarded Morgan no damages on the default judgment. *See* Order of February 14, 1996 at 1–2.

The Mine asserts, and Morgan does not deny, that all negotiations for this modification took place between Khrapko and Donahoe in Ukraine, and that Donahoe signed the contracts on behalf of Morgan.

The Mine states that it was prepared to perform in March or April, 1993, weather permitting. The shipments of ore, however, did not begin until May, 1993 because Morgan failed to provide a sufficient number of barges to receive delivery. The Mine asserts, and Morgan does not deny, that Morgan received approximately 150,-000 metric tons of iron ore for which the Mine has yet to receive any payment in cash or equipment. Under the terms of the contract, this iron ore concentrate was worth $2,335,429.79. The Mine instituted arbitration proceedings in Ukraine to recover its losses.

At this point, the parties' accounts converge again. When the Mine sought to compel arbitration in Ukraine, Morgan suggested that the parties meet in Vienna on April 13, 1994 to discuss the dispute. Although the Mine agreed, before the meeting occurred, Morgan filed suit in this Court on April 11, 1994, seeking damages and a declaratory judgment that Contracts 954/93, 328/1, and 328/2 were void because of alleged fraud by the Mine.

The Mine failed to answer the complaint or to move to dismiss it, and failed to attend status conferences concerning the case. The Mine communicated to the Court that it would not participate in the case because of the arbitration provision in the contracts. The Court granted Morgan's request for entry of default on December 22, 1994. *See* Order of December 22, 1994 at 1. Morgan then applied for entry of default judgment against the Mine.

The Court referred the matter to Magistrate Judge Wayne D. Brazil. The Mine again failed to appear at both a status conference and an evidentiary hearing concerning the case, despite being notified of these proceedings. On July 18, 1995, Judge Brazil filed a report and recommended that Morgan's request for entry of default judgment be denied. *See* Report and Recommendation of July 18, 1995 at 25. One factor on which Judge Brazil based his recommendation was his conclusion that Morgan had intentionally manipulated its complaint to sound in tort, and not contract, so that it could evade its obligations under Contract 954/93. *Id.* at 8–9. Judge Brazil also expressed serious reservations about the veracity and sincerity of Morgan's factual allegations and the sufficiency of its complaint. *See, e.g.,* Report and Recommendation of July 18, 1995 at 9–10, 14, 17–20.

Morgan objected to the Report and Recommendation. By Order of February 14, 1996, the Court entered a default judgment against the Mine. *See* Order of February 14, 1996 at 2. The Court noted that despite proper service of an adequate complaint, and actual notice, the Mine never appeared in the case, whether to dispute service or jurisdiction, to assert its claim to compel arbitration, or to contest Morgan's claims. *Id.* at 1–2.

Although the Court entered a default judgment against the Mine, it agreed with Judge Brazil's assessment that Morgan had failed to prove its claimed damages, especially in light of the $2.3 million that Morgan earned from the sale of the iron ore concentrate provided by the Mine. *Id.* at 2. The Court, therefore, awarded no damages to Morgan. While the Court did award declaratory judgment stating that Contracts 328–1–93 and 328–2–93 were void, as alleged in Morgan's complaint, it did not declare that Contract 954/93 was void, even though Morgan's third claim for relief requested such relief. *See id.* 1–2.

On March 12, 1998, the Mine sued Morgan in this Court for breach of contract and related claims arising out of the iron ore transaction. The Court dismissed nine of the Mine's ten causes of action. On June 26, 1998, the Mine filed the present motion for relief from default judgment, pursuant to Rule 60(b)(4).

## DISCUSSION

### A. Standard for Relief Under Rule 60(b)(4)

■ Rule 60(b)(4) states, "On a motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons ... (4) the judgment is void." Fed. R.Civ.P. Rule 60(b)(4). If the court determines that the judgment is void, it has no discretion to deny relief from judgment. *Thos. P. Gonzalez Corp. v. Consejo Nacional de Produccion de Costa Rica*, 614 F.2d 1247, 1256 (9th Cir.1980). A default judgment is void if the court that rendered it lacked subject matter jurisdiction. *United States v. Forma*, 42 F.3d 759, 762 (2d Cir.1994); see also 11 Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, *Fed. Practice & Proc.*, § 2862 (West 1995).

■ Because Rule 60(b) is remedial in nature, courts must be liberal in granting relief. *Meadows v. Dominican Republic*, 817 F.2d 517, 521 (9th Cir.), *cert. denied*, 484 U.S. 976, 108 S.Ct. 486, 98 L.Ed.2d 485 (1987)(citing *Schwab v. Bullock's Inc.*, 508 F.2d 353, 355 (9th Cir.1974)). Moreover, "since the interests of justice are best served by a trial on the merits, only after a careful study of all relevant considerations should courts refuse to open default judgments." *SEC v. Seaboard Corp.*, 666 F.2d 414, 417 (9th Cir.1982)(quoting *Patapoff v. Vollstedt's Inc.*, 267 F.2d 863, 865 (9th Cir.1959)).

■ Morgan would have the Court assume the truth of all facts alleged in its complaint, including those contested by the Mine's evidence, in making its determination. In support of this position, Morgan cites to the Ninth Circuit's decision in *Export Group v. Reef Industries, Inc.*, 54 F.3d 1466, 1468–69 (9th Cir.1995). In *Export Group*, the court—in reviewing an order by the district court setting aside a default judgment on the grounds that the court lacked subject matter jurisdiction under the Foreign Sovereign Immunities Act (FSIA)—noted in dicta that it would accept the facts alleged in the complaint as true. *Id.* at 1468. Although it is not clear whether any material facts in the complaint were in dispute in *Export Group*, the cases on which *Export Group* relies involve procedural circumstances wherein the truth of the facts alleged in the complaint had not been challenged by affidavits or other admissible evidence. *See Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 706–07 (9th Cir.1992), *cert. denied*, 507 U.S. 1017, 113 S.Ct. 1812, 123 L.Ed.2d 444 (1993)(citing *Gerritsen v. de la Madrid Hurtado*, 819 F.2d 1511, 1513 (9th Cir.1987)).[3] In contrast to the cases cited in *Export Group*, here the Mine has introduced substantial admissible evidence to contest the factual allegations in Morgan's complaint.

The expansive reading of *Export Group* advocated by Morgan conflicts with long-settled principles for determining jurisdiction. The Ninth Circuit recently applied these principles in the context of an FSIA case: "a district court 'may properly look beyond the complaint's jurisdictional allegations and view whatever evidence has been submitted to determine whether in fact subject matter jurisdiction exists.'" *Adler v. Federal Republic of Nigeria*, 107 F.3d 720, 728 (9th Cir.1997)(citing *Bowyer v. U.S. Dept. of Air Force*, 875 F.2d 632 (7th Cir.1989), *cert. denied*, 493 U.S. 1046, 110 S.Ct. 846, 107 L.Ed.2d 840 (1990)). The *Adler* court further noted that "a district court 'has considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction.'" *Adler*, 107 F.3d at 728 (citing *Foremost–McKesson v. Islamic Republic of Iran*, 905

---

3. The *Gerritsen* court, in turn, cited the Supreme Court's decision in *Scheuer v. Rhodes*, 416 U.S. 232, 235–36, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). In *Scheuer*, the Court stated that "when a federal court reviews the sufficiency of a complaint, *before the reception of any evidence either by affidavit or admissions*, its task is necessarily a limited one." *Id.* at 236, 94 S.Ct. 1683 (emphasis added).

F.2d 438, 449 (D.C.Cir.1990)("where the suit involves a foreign sovereign and the court's jurisdiction over the sovereign is contested, the district court must do more than just look to the pleadings to ascertain whether to grant the motion")); *see also Grafon Corp. v. Hausermann,* 602 F.2d 781, 783 (7th Cir.1979)("district court is not bound to accept as true the allegations of the complaint which tend to establish jurisdiction").[4] The Court finds that *Export Group* does not require the Court to accept as true factual allegations regarding jurisdiction, if those allegations are disputed by admissible evidence. If the Court were to assume the truth of the disputed factual allegations in Morgan's complaint, the Court might affirm an earlier decision that it lacked subject matter jurisdiction to render.

## B. Foreign Sovereign Immunities Act

### 1. Legal Standard

■ The FSIA " 'provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country.' " *Saudi Arabia v. Nelson,* 507 U.S. 349, 355, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989)); 28 U.S.C. §§ 1330, 1602–11. A foreign state, defined to include "an agency or instrumentality of a foreign state," is presumptively immune from the jurisdiction of the United States courts. *See* 28 U.S.C. §§ 1603(a), 1604. Therefore, a federal court lacks subject matter jurisdiction over a claim against a foreign state unless a specified exception to the FSIA applies. *See Saudi Arabia,* 507 U.S. at 355, 113 S.Ct. 1471 (citing *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 488–89, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983)).

■ The party seeking immunity bears the initial burden of establishing a prima

facie showing that it qualifies as a foreign state under the FSIA. *Phaneuf v. Republic of Indonesia,* 106 F.3d 302, 305 (9th Cir. 1997); *Gates v. Victor Fine Foods,* 54 F.3d 1457, 1463 (9th Cir.), *cert. denied,* 516 U.S. 869, 116 S.Ct. 187, 133 L.Ed.2d 124 (1995) (citing *Joseph v. Office of Consulate General of Nigeria,* 830 F.2d 1018, 1021 (9th Cir.1987), *cert. denied,* 485 U.S. 905, 108 S.Ct. 1077, 99 L.Ed.2d 236 (1988)). Once the prima facie case is established, the burden shifts to the plaintiff to offer evidence that an exception to the FSIA applies. *Phaneuf,* 106 F.3d at 307. If the plaintiff meets this burden, the burden shifts back to the party seeking immunity to demonstrate by a preponderance of the evidence that the exception does not apply. *Id.*

### 2. Agency or Instrumentality of a Foreign State

The FSIA, 28 U.S.C. § 1603(b), defines an agency or instrumentality of a foreign state as:

an entity -

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b). Here, Morgan concedes in its original complaint, and does not now dispute, that the Mine is in fact an agency or instrumentality of a foreign state.

### 3. Commercial Activity Exception

As an agency or instrumentality of a foreign state, the Mine is entitled to immu-

---

4. The Seventh Circuit's reasoning; in both *Bowyer* and *Grafon,* derives from the Supreme Court's decision in *McNutt v. General*

*Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936).

nity from suit unless the Court finds that one of the exceptions under the FSIA applies. Title 28 U.S.C. § 1605(a) establishes a number of exceptions to the general rule under the FSIA that a foreign state is immune to the jurisdiction of United States courts. 28 U.S.C. § 1605(a)(1)-(6). The only exception relevant in the present case is the "commercial activity" exception, which allows a federal court to exercise jurisdiction over a case:

> in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).

Under the FSIA, "commercial activity" is defined as such activity "carried on by such state and having *substantial* contact with the United States." 28 U.S.C. § 1603(e)(emphasis added). In addition, " 'commercial activity' means either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). The act further provides that the "commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." *Id.* The court, therefore, must focus only on the conduct on which a plaintiff's action is based. *Saudi Arabia v. Nelson,* 507 U.S. at 356, 113 S.Ct. 1471; *Gates,* 54 F.3d at 1463.

Morgan contends that the Mine is subject to jurisdiction under each of the three parts to the commercial activity exception. Bearing in mind the shifting burdens of proof in FSIA cases, the Court will consider separately each of these exceptions—any one of which, if applicable, provides a sufficient basis for jurisdiction.

a. Substantial Commercial Activities in the United States

■ Morgan first argues that the Court has jurisdiction because the Mine engaged in "substantial" commercial activities in the United States. 28 U.S.C. §§ 1603(e), 1605(a)(2). The Ninth Circuit has held that there must be a "nexus" between the foreign state's commercial activities and the specific facts forming the plaintiff's grievance. *America West Airlines, Inc. v. GPA Group, Ltd.,* 877 F.2d 793, 796–97 (9th Cir.1989)(commercial activity must be conduct on which lawsuit is based); *Siderman,* 965 F.2d at 709 (advertisements in the United States and solicitation of American customers is sufficient commercial activity); *see also General Elec. Capital Corp. v. Grossman,* 991 F.2d 1376, 1383–84 (8th Cir.1993)(single meeting between parties in United States, along with use of mails, wire, and telephones not sufficient nexus); *Shapiro v. Republic of Bolivia,* 930 F.2d 1013, 1019 (2d Cir.1991) (raising capital by introducing negotiable promissory notes into United States is sufficient).

■ In support of this theory, Morgan argues that a contract, worth $5.6 million in equipment, negotiated in the United States, with an American corporation constitutes substantial activity. Moreover, Morgan argues that the required nexus exists because the fraud alleged in its complaint occurred during the course of negotiations for the contract.[5] Morgan further points to Khrapko's attendance at MINExpo, and his efforts there to purchase other equipment required by the Mine. Morgan

---

5. Morgan's complaint states only that "during and after" the negotiations Khrapko told Harold Morgan that "the Mine would sell its entire annual output of iron ore to Morgan." Complaint at ¶ 26. Notably, Morgan does not allege either that these representations were made in San Francisco or that the Mine promised to sell its entire annual output for any year other than 1993. Complaint at ¶ 26; *see also* Judge Brazil's Report and Recommendation of July 18, 1995 at 20–21.

has clearly met its relatively light burden of putting forth evidence that the exception applies. It is thus incumbent upon the Mine to demonstrate, by a preponderance of the evidence, that it did not conduct substantial commercial activity in the United States.

The Mine argues that the negotiations for Contract 954/93 were almost entirely conducted in Ukraine, with only minor adjustments being made in San Francisco.[6] The Mine states, and Morgan sharply contests, that Donahoe and McMurray both traveled to Ukraine in order to pursue negotiations. Morgan's contention that neither of these two representatives had any authority to negotiate a contract is difficult to reconcile with their signatures on the Letter of Protocol, which the Mine argues was an early draft contract. If Donahoe and McMurray were only in Ukraine to gain a better understanding of the Mine's needs there would be no purpose in signing this document. Donahoe also concedes in his declaration that he later signed Contract 328/1 and Contract 328/2 on behalf of Morgan.

Moreover, as the Mine persuasively argues, even a cursory comparison between the contract that Khrapko brought to San Francisco and the final draft of Contract 954/93 demonstrates that the overall structure and general terms changed little. See Schuman Decl. Ex. A (Khrapko's draft); Akay Decl. Ex. A (final draft). Among the many and important provisions that did not change are the quantity of ore, the price per ton of ore, most of the price and quantity terms for equipment, and sched-

uling. It is clear that some negotiations took place in San Francisco; however, the resulting changes in the contract appear to reflect minor accommodations of the Mine's needs in light of Morgan's ability to find suppliers, rather than the results of the heated debates Morgan portrays.[7]

The Court finds Morgan's account of the negotiations unpersuasive. For example, Morgan asserts that for three days, in San Francisco, the parties vigorously negotiated the price per ton for iron ore. Morgan contends that Khrapko insisted on over $22.00 per ton and finally settled for $19.00. As the Mine points out, however, if Khrapko had initially sought the higher price, it is highly unlikely that he would have arrived in San Francisco with a draft contract stating $19.00 per ton.

The Mine points to several other facts to support its argument that it had no substantial commercial activity in the United States. First, Morgan does not contest that all of the modifications to Contract 954/93 took place in Ukraine. In addition, the previous contract, Contract 954/92, was entirely negotiated and performed outside of the United States. The Mine maintains no offices in the United States, nor has it ever solicited business here. No evidence was introduced even to show that the Mine had prior dealings with other American corporations. Although Khrapko readily concedes that he attended MINExpo, it is undisputed that the discussions that purportedly took place during the trip had no effect on Contract 954/93. Lastly, the Mine correctly notes that the extensive testimony introduced regarding Morgan

---

6. Even if the Court were to assume the truth of the factual allegations in Morgan's complaint, Morgan states only that "a material portion of those negotiations occurred in San Francisco, California ... Substantive discussions during these meetings occurred concerning price, quantity, and quality." The Court need not accept Morgan's conclusory allegation that a "material" portion of the negotiations took place in the United States. Smilecare Dental Group v. Delta Dental Plan, 88 F.3d 780, 785 n. 6 (9th Cir.), cert. denied, 519 U.S. 1028, 117 S.Ct. 583, 136 L.Ed.2d

513 (1996); Rutman Wine Co. v. E. & J. Gallo Winery, 829 F.2d 729, 735–36 (9th Cir.1987). The remainder of Morgan's factual allegations, even if true, are insufficient to establish jurisdiction. The Court, therefore, must look beyond the allegations of the complaint, even under Morgan's expansive reading of Export Group.

7. This interpretation is consistent with Morgan's non-conclusory factual allegations in its complaint. See Complaint at ¶¶ 4–7.

representatives' considerable research and prepatory efforts in the United States is irrelevant. The work of Morgan cannot be used to demonstrate the Mine's commercial activities.

The Mine has met its burden of demonstrating by a preponderance of the evidence that it did not conduct substantial commercial activities in the United States in relation to Morgan's claim. Although some negotiations and the formal signing took place in San Francisco, because the core of negotiations took place abroad, this is insufficient to demonstrate the required nexus. *See Grossman*, 991 F.2d at 1383–84; *Gibbons v. Udaras na Gaeltachta*, 549 F.Supp. 1094, 1113 (S.D.N.Y.1982)(substantial contact exists if "substantial contractual negotiations occurred here" or "substantial aspects of the contract were to be performed here"). Aside from these negotiations, the Court can find no evidence that the Mine has conducted commercial activities in the United States at all. The first part of the commercial activity exception to the FSIA is inapplicable.

. b.   Acts Performed in the United States

█   Because Morgan's argument under the second prong of the commercial activity exception—for cases involving "an act performed in the United States in connection with a commercial activity of the foreign state elsewhere"—is predicated on its contention that the material portion of negotiations took place in San Francisco and not Ukraine, the Court similarly finds that this second part of the commercial activity exception is inapplicable. 28 U.S.C. § 1605(a)(2).

c.   Acts With Direct Effects in the United States

█   Lastly, Morgan argues that even if the Court finds that the negotiations took place in Ukraine, jurisdiction is still proper under the third part of Section 1605(a)(2) because the Mine's commercial activity had a "direct effect in the United States." 28 U.S.C. § 1605(a)(2); *Republic of Argen-*

*tina v. Weltover, Inc.*, 504 U.S. 607, 614,. 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992). The only direct effect claimed by Morgan is the financial loss to the company from the Mine's alleged breach and its failure to honor Khrapko's promise that Morgan would be the exclusive recipient of the Mine's exports. Again, Morgan has put forth sufficient evidence, in the form of declarations, to meet its initial burden.

The Mine, conversely, argues that for a financial loss to constitute a direct effect, the corporate entity must be placed in financial peril as a result of the defendant's activities. *Weltover, Inc. v. Republic of Argentina*, 941 F.2d 145, 152 (2d Cir.1991); *see also Gregorian v. Izvestia*, 871 F.2d 1515, 1526–27 (9th Cir.), *cert. denied*, 493 U.S. 891, 110 S.Ct. 237, 107 L.Ed.2d 188 (1989)(direct effect is one that is substantial and foreseeable, mere financial loss is insufficient). The Mine further argues that any alleged financial loss must be the result of legally significant acts occurring in the United States. *Grossman*, 991 F.2d at 1385 (citing *Weltover*, 504 U.S. at 619–20, 112 S.Ct. 2160). The Mine contends that because Morgan failed to incur any losses and because the contract was negotiated in Ukraine, there is no direct effect.

The Court finds several problems with the Mine's arguments. First, Morgan argues, and the Court agrees, that the Supreme Court's decision in *Weltover* rejected the "substantial" and "foreseeable" test used in *Gregorian*. *Weltover*, 504 U.S. at 618, 112 S.Ct. 2160. In addition, although the primary negotiations took place in Ukraine, the signing of Contract 954/93 in San Francisco is a legally significant act occurring in the United States. If coupled with an actual financial loss, this act could constitute a direct effect under the FSIA.

Nonetheless, the Court finds that Morgan's alleged financial losses do not meet the requirements of a direct effect under Section 1605(a)(2). First, as the Mine contends and Judge Brazil noted, Morgan fails to present any evidence to support its

implausible assertion that in preparation for performance it expended resources and forewent business opportunities worth in excess of the $2.3 million of ore it received from the Mine.[8] *See* Report and Recommendation of July 18, 1995 at 13–14. Morgan introduces no evidence to demonstrate that it incurred serious losses; indeed, the record, as it currently exists, tends to show that Morgan has received a substantial windfall.

Furthermore, Morgan's assertion that it suffered loss of future profits from the Mine's repudiation of its promise to make Morgan the exclusive recipient of its exports finds no support in the record. Contract 954/93, signed by Morgan's president, makes no mention of such a promise. In addition, Section 9.4 contains an integration clause, nullifying all prior negotiations not included in the contract. The Court finds no alternative factual or legal basis for Morgan's claim of loss of future profits. Because Morgan has failed to put forward any evidence to demonstrate that it has suffered any monetary loss from its interaction with the Mine, the Court finds the direct effect clause of the commercial activity exception inapplicable.

Having determined that none of the three prongs of the commercial activity exception to sovereign immunity apply, the Court holds that it lacks subject matter jurisdiction over the Mine under the FSIA.[9]

C. Waiver of Sovereign Immunity

Morgan further argues that the Mine waived any claim to immunity by filing Case No. C98–00958 in federal court in the United States. Morgan's argument relies on the faulty premise that the Court should consider the Mine's acts, *subsequent* to the entry of default judgment in 1996, in determining whether jurisdiction was proper in the original case. In making this argument, Morgan relies on the Ninth Circuit's decision in *Siderman,* 965 F.2d at 704. *Siderman,* however, involved a situation in which the foreign entity had availed itself of United States courts *prior* to its attempt to claim immunity. *Id.* In the present case, whether the Mine has availed itself of the courts of the United States in 1998 is irrelevant to the issue of whether the Court had jurisdiction to enter default judgment two years earlier.

## CONCLUSION

For the foregoing reasons, Defendant's Rule 60(b)(4) motion is granted. Default judgment in C 94–1231 CW is set aside. A case management conference will be held in C 94–1231 CW and C 98–0958 CW on December 18, 1998 at 1:30 p.m. Any motion to compel arbitration and any other motions that are ripe for filing shall be noticed for hearing on that date.

---

8. Even Morgan's complaint lends little support to its position. In its complaint, Morgan merely alleges that it forewent lucrative business opportunities valued at $1.5 million and that it expended "substantial sums" in performing and preparing to perform. Complaint at ¶¶ 21–23. Even if the Court were to accept these allegations as true, Morgan has introduced no evidence to demonstrate that it spent more than $800,000 in preparing to perform its obligations under the contract.

9. Morgan contends that because of the death of key witness Harold Morgan, it will be prejudiced by this result. According to Morgan's Opposition, however, both Donahoe and Ms. Katya Able, Morgan's interpreter, were present during the alleged San Francisco negotiations. Donahoe has already submitted a declaration and been deposed. The Court finds that any prejudice resulting from Morgan having to defend on the merits is minimal.